[Crim. No. 3513. Third Dist. Aug. 13, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. VINCENT FUENTES HERNANDEZ, Defendant and Appellant.

144

Ralph D. Drayton, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Daniel J. Kremer, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—At the time of his apprehension and conviction of heroin possession (Health & Saf. Code, § 11500), defendant was a paroled state prisoner. On appeal from the judgment of conviction he contends that the heroin in his automobile was uncovered as the result of an unreasonable search and seizure by his parole officer, hence inadmissible in proof of guilt.

Defendant Hernandez was paroled from state prison in November 1962. Edward Boulton, a state parole agent, was his parole officer. In April 1963 a narcotics agent received information from an unidentified informer that Hernandez might have narcotics on his person or in his automobile. This information was passed on to Parole Officer Boulton. Hernandez was employed at a restaurant and his shift terminated at midnight. Boulton and four narcotics agents stationed themselves in the restaurant parking lot shortly before midnight. When he finished work, Hernandez left the restaurant and approached his parked automobile. He was about to enter the car when the officers appeared. Boulton told him that he was going to search the car. Boulton did so and found 53 grams of heroin in the rear compartment. Later at headquarters Hernandez was found to have two bindles of heroin and $620 in cash on his person. The officers had no search warrant.

At defendant's trial Parole Officer Boulton testified that he had arranged the meeting for the specific purpose of searching defendant's car and for no other purpose. Defense counsel objected to evidentiary use of the heroin as the product of an illegal search and seizure and demanded disclosure of the police informer's identity. The objection was overruled. It was stipulated that the prosecution would decline to reveal the informer's name by invoking Code of Civil Procedure section 1881, subdivision 5.[1]

We approach the matter against the following decisional backdrop: In 1955 *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], established the rule in California that evidence obtained in violation of the Fourth Amendment guaranty against unreasonable search and seizure is inadmissible in criminal trials. Among the spate of decisions

---

[1]Code of Civil Procedure, section 1881, subdivision 5, provides: "5. A public officer cannot be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

which followed *Cahan* were four dealing with "search and seizure" contentions raised by paroled state prisoners. These four decisions occurred in 1956 and 1957. First was *People v. Denne,* 141 Cal.App.2d 499 [297 P.2d 451], in which the court assumed, *arguendo,* that Fourth Amendment guaranties could be asserted by a parolee; holding, however, that a warrantless search by the parole officer was reasonable because of the special relationship between the parolee and the authorities who supervised his conduct on parole. Speaking for the court, Mr. Justice Fox stated: "A prisoner on parole is not free from legal restraint by the penal authorities (*In re Marzec,* 25 Cal.2d 794, 797 [154 P.2d 873]) but 'is constructively a prisoner of the state in the legal custody and under the control of the state board of prison directors.' . . . Because the public is entitled to maximum protection in the administration of the parole system, the process of rehabilitation takes place under the vigilant and tutelary eye of the parole officer. . . . Since the parolee constitutes a calculated risk to the security of the community, and since a breach of the faith reposed in him may subject him to summary return to the prison confines, the parole officer, in the nature of things, is accorded broad visitatorial powers over his prisoner. . . . By accepting the privilege of parole a prisoner consents to the broad supervisory and visitatorial powers which his parole officer must exercise over his person and property until the term of his sentence shall have expired or been terminated." (141 Cal.App.2d at pp. 507-510.)

The *Denne* case upheld evidentiary use of narcotics uncovered by a parole officer who had gone to the defendant's apartment to take him into custody and had searched the apartment in his absence. Similarly, in *People v. Robarge,* 151 Cal.App.2d 660 [312 P.2d 70], and *People v. Contreras,* 154 Cal.App.2d 321 [315 P.2d 916], the parole officer had discovered narcotics in the course of a search incidental to the defendant's apprehension for a parole violation. In all three cases the search was a byproduct of the parole officer's prior determination, upon probable cause, to apprehend the parolee. *People v. Triche,* 148 Cal.App.2d 198 [306 P.2d 616], represents a variation. There the parole officer had gone to defendant's premises not to make an arrest but in the course of surveillance. His warrantless search revealed narcotics. Nevertheless, in the *Triche* case, as in *Denne, Robarge,* and *Contreras,* the search was held to be reasonable because of the parole officer's special supervisory and visitatorial powers.

All four of these decisions assumed the necessity of some kind of probable cause.[2]

These four decisions antedated *Priestly* v. *Superior Court,* 50 Cal.2d 812 [330 P.2d 39], decided in 1958. *Priestly* requires disclosure of the identity of a police informant whose communication is relied upon as probable cause for a warrantless search. The present appeal is the first "parolee" case since the *Priestly* decision. It requires us to decide whether the *Priestly* doctrine applies to a parole officer's search of a parolee's person, automobile or home.

The concept of probable cause unfolded in *Priestly* v. *Superior Court* included an element which was not clearly revealed at the time of *Denne* and its companion decisions. The new element was the anonymous informer.[3] If, as a result of the *Priestly* decision, disclosure of the informer's identity is an inescapable ingredient of "probable cause," then the doctrine of *People* v. *Denne* falls considerably short of justifying admission of the heroin in the case at bench. Not only did defendant's connection with narcotics have its source in an unnamed informant; it was stipulated that the informant would remain cloaked in anonymity. Aside from Hernandez's status as a prior narcotics offender, the anonymous communication was the only component of probable cause for the search.

We arrive at a point where some kind of *détente* between the *Priestly* rule and the *Denne* group of decisions seems necessary. *Priestly* is simply a manifestation of a general exclusionary doctrine, barring evidentiary use of evidence produced by an unconstitutional search and seizure. Where the officer has no warrant, his search meets Fourth Amendment standards of reasonableness if it is incidental to an arrest made upon probable cause. (*Ker* v. *California,* 374 U.S. 23, 34-35, 41 [83 S.Ct. 1623, 10 L.Ed.2d 726]; *People* v.

[2]We recognize but do not accept a dictum in *People* v. *Goss,* 193 Cal. App.2d 720, 725 [14 Cal.Rptr. 569], which describes the *Denne* case as denying parolees [all] constitutional immunity against unreasonable searches and seizures. There is a marked legal distinction between arbitrary search by the parole authorities whom the law (see Pen. Code, §§ 3040-3065) places in control of the parolee and one by general law enforcement officers.

[3]*People* v. *Robarge, supra,* 151 Cal.App.2d at page 667, presages the *Priestly* case and the present problem in considering the confidential informant who supplies information leading to the apprehension and search of a parolee. In *Robarge* the problem was not acute, because there was reasonable cause other than that supplied by the informer.

*Winston,* 46 Cal.2d 151, 162 [293 P.2d 40].) The court not the officer must make the determination whether the latter has a belief or state of mind amounting to probable cause. (*People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967].) Reliability of an informer whose communication is claimed as probable cause is an ingredient of the inquiry, and the defense cannot fairly make this inquiry if the informer's identity is concealed. (*Priestly* v. *Superior Court, supra,* 50 Cal.2d at p. 818.) In this case, Parole Officer Boulton professed no prior determination to take Hernandez into custody. Because of information emanating from an anonymous source, he decided to search the parolee's car for narcotics and enlisted the help of other officers to that end. Search and not arrest was his immediate purpose. Weighed on the standard scale, the officer's entry into the automobile in a direct quest for incriminating evidence possessed dubious legality. (See *People* v. *Edgar,* 60 Cal.2d 171, 175 [383 P.2d 449] ; *People* v. *Cahan, supra,* 44 Cal.2d at p. 445.)

These standard concepts of arrest and probable cause for arrest have little relevance as between correctional authorities and paroled prisoners. The parolee, although physically outside the walls, is still a prisoner; his apprehension, although outwardly resembling arrest, is simply a return to physical custody. (*People* v. *Denne, supra,* 141 Cal.App.2d at p. 510.) To weigh retaking of a parolee on scales calibrated for standard cases of arrest and probable cause is to compare incomparables. The decisive question in this case is not whether the parole officer had probable cause for an arrest and incidental search, but whether his paroled prisoner could invoke constitutional barriers against the search.

At this point we confront authorities theorizing that parole is an act of grace, acceptance of which entails the voluntary surrender or curtailment of constitutional rights. (See Note 65 Harv.L.Rev. 309 at p. 310, fns. 11, 12.) The rationale is not particularly appealing. It makes constitutional rights dependent upon a kind of ''contract'' in which one side has all the bargaining power. A better doctrine is that the state may not attach unconstitutional conditions to the grant of state privileges. (*Danskin* v. *San Diego Unified Sch. Dist.,* 28 Cal.2d 536, 545-546 [171 P.2d 885] ; see also *Fort* v. *Civil Service Co.,* 61 Cal.2d 331, 334-335 [38 Cal.Rptr. 625, 392 P.2d 385].) The problem should be approached by considering what constitutional guaranties the individual may claim as a paroled prisoner of the state, not what constitutional liberties he surrendered as a condition of parole.

■ Inmates of state prisons do not have the usual array of federal and state constitutional rights guaranteed to non-incarcerated citizens. (*Price* v. *Johnston,* 334 U.S. 266, 285 [68 S.Ct. 1049, 92 L.Ed. 1356]; *In re Ferguson,* 55 Cal.2d 663, 670-671 [12 Cal.Rptr. 753, 361 P.2d 417]; *Snebold* v. *Justice Court,* 201 Cal.App.2d 152, 154 [19 Cal.Rptr. 704].) Prison authorities may subject inmates to intense surveillance and search unimpeded by Fourth Amendment barriers. (*Lanza* v. *New York,* 370 U.S. 139, 143 [82 S.Ct. 1218, 8 L.Ed.2d 384].) ■ Although a parolee is not a prison inmate in the physical sense, he is constructively a prisoner under legal custody of the State Department of Corrections and may be returned to the prison walls without notice and hearing. (Pen. Code, § 3056; *In re Davis,* 37 Cal.2d 872, 874 [236 P.2d 579]; *In re Marzec,* 25 Cal.2d 794, 797 [154 P.2d 873]; *People* v. *Goss,* 193 Cal.App.2d 720, 724 [14 Cal. Rptr. 569]; *In re Dearo,* 96 Cal.App.2d 141, 144 [214 P.2d 585]; see Comment 28 So.Cal.L.Rev. 158-175.) In actual fact he moves about in free society, fettered by the conditions and restrictions of his parole. Thus his status differs somewhat from that of unreleased prisoners. To an extent not necessary to ascertain here, he may be able to assert constitutional guaranties and safeguards against arbitrary or oppressive official action. (See *In re Jones,* 57 Cal.2d 860, 862 [22 Cal.Rptr. 478, 372 P.2d 310].) ■ So far as necessary for the maintenance of parole guardianship, his status as a prisoner is no different than one who remains in confinement. His release entails calculated social risks. Recidivism is all too common. As a rough statistic, approximately one-half of all California parolees return to prison within five years, either as the result of parole revocation or a new felony commitment. (Table 18, Report, Director of Corrections, Mar. 4, 1964, filed with Assembly Committee on Criminal Procedure; see also, p. 71, *California Prisoners* (1960) Dept. of Corrections.) At least as significant is the obverse statistic, that approximately half of the parolees reach the goal of rehabilitation. Criminal acts by parolees evoke public resentment and criticism of the parole authorities, usually stemming from failure to understand the purpose and operation of an enlightened parole system. Close supervision, surveillance and control not only minimize the social risks inherent in parole, but safeguard the system for the sake of those who make good. Intense scrutiny by the correctional authorities is a vital ingredient of a publicly acceptable

parole system. ■ For the purpose of maintaining the restraints and social safeguards accompanying the parolee's status, the authorities may subject him, his home and his effects to such constant or occasional inspection and search as may seem advisable to them. Neither the Fourth Amendment nor the parallel guaranty in article I, section 19, of the California Constitution blocks that scrutiny. He may not assert these guaranties against the correctional authorities who supervise him on parole. (See *Story* v. *Rives,* 97 F.2d 182, 188 [68 App. D.C. 325].) If this constitutional fact strips him of constitutional protection against invasions of privacy by his parole officer, the answer is that he has at least as much protection as he had within the prison walls. He did not possess this guaranty in prison and it was not restored to him when the gates of parole opened.

Conceivably, the close scrutiny available to the parole authorities should be restricted to the sphere of parole administration. The heroin in Hernandez' possession led to results other than parole revocation, serving as foundation for a fresh criminal prosecution and conviction. We would assume that criminal prosecution of a parolee should be accompanied by the procedural safeguards and guaranties attending criminal prosecutions generally. (Cf. *People* v. *Goss, supra,* 193 Cal.App.2d 720.) On that assumption, it is hardly accurate to say that he stands stripped of constitutional rights. Here we have a more limited inquiry—whether evidence was seized through the lawless activities of enforcement officials. If it was lawfully obtained, it was available to enforce any law which might have been violated. (*Mardis* v. *Superior Court,* 218 Cal.App.2d 70, 76 [32 Cal.Rptr. 263]; *People* v. *Triche, supra,* 148 Cal.App.2d at p. 204.)

■ Defendant draws an analogy to cases upholding constitutional rights of persons on probation. (See *Martin* v. *United States,* 183 F.2d 436; *Truchon* v. *Toomey,* 116 Cal. App.2d 736 [254 P.2d 638, 36 A.L.R.2d 1230]; cf. *Stephens* v. *Toomey,* 51 Cal.2d 864 [338 P.2d 182].) The analogy fails. So long as he remains on probation, the individual never enters state prison and never suffers the disabilities resulting from entry. The prison inmate forfeits civil rights (Pen. Code, § 2600) and, as we have noted, is divested of a large measure of constitutional rights. The extent to which parole serves as a constitutional restorative is measured by considerations quite different than those attending probation.

■ We conclude that the requirement of reasonable or probable cause does not apply to search of a paroled prisoner

when conducted by his parole supervisors. ■ Thus the *Priestly* rule, requiring identification of the informer whose communication supplies probable cause, has no application to such a search; nor does it bar prosecution use of evidence produced by that search. In reaching this conclusion, we recognize that disclosure of an informer's identity may be required when relevant and helpful to the defense. (*Roviaro* v. *United States*, 353 U.S. 53 [77 S.Ct. 623, 1 L.Ed.2d 639]; *People* v. *McShann*, 50 Cal.2d 802 [330 P.2d 33].) There is a distinction between situations where the informer is a material witness on the issue of guilt and those where he simply points the finger of suspicion at the defendant. (*People* v. *McShann, supra,* 50 Cal.2d at p. 808.) In the latter situation, illustrated by the *Priestly* case, disclosure is imposed on the prosecution because the informer's communication furnishes probable cause for search without a warrant. ■ Here, where the requirement of probable cause does not stand between the parole officer and the parolee, the informer's identity is irrelevant, and his anonymity imposes no handicap on the defense.

Judgment affirmed.

Pierce, P. J., and Moor, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 7, 1964. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.