[Crim. No. 5473. First Dist., Div. One. June 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LEONARD THOMPSON, Defendant and Appellant.

Philip L. Grauman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy and Gloria F. DeHart, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, P. J.—Defendant appeals from the judgment of conviction entered upon a verdict finding him guilty of kidnaping for the purpose of committing robbery (violation of Pen. Code, § 209),[1] assault with a deadly weapon on a peace officer (violation of § 245, subd. (b), possession of a firearm by a convicted felon (violation of § 12021), and two counts of robbery (violation of § 211). Defendant's contentions are as follows: that certain evidence was illegally obtained and therefore should not have been introduced; that the evidence was insufficient to support the verdict as to all counts excepting assault; that the count charging possession of a firearm should have been dismissed prior to trial upon defendant's motion under section 995; that the trial court failed to give certain instructions; that the trial court's comment as to his opinion regarding defendant's guilt was improper; that defendant was denied the effective assistance of counsel; and that the various errors committed by the trial court resulted individually and cumulatively in a miscarriage of justice.[2]

*The Record*

On the evening of May 19, 1965, Dr. and Mrs. Alexander Riskin were at their home at 120 Belgrave, San Francisco. At approximately 10 p.m. their front doorbell rang and Mrs. Riskin proceeded to the door to open it. As she did so two men pushed their way into the house. One, who was wearing a dark green toggle coat and had a ski mask over his face, carried a gun; the other wore no mask and carried a large knife. As the men entered Mrs. Riskin started screaming. The man with the gun said, "Shut up; shut up or I will kill you." However, she continued to scream so that the man with the gun put his hand over her mouth and pushed her to the floor. At the same time he told Dr. Riskin, who had followed his wife to the front door, to sit down on the floor. Dr. Riskin then asked the men not to hurt his wife because she was just home from the hospital. In response to this request one of the men replied, "We know all about it. We read it in a newspaper and that is why we are here." One of the men then went in the Riskin's living room where Marilyn, their daughter-in-law, had been conversing by telephone with her

---

[1]Unless otherwise indicated, all statutory references are to the Penal Code.

[2]In his opening brief defendant also contended that the sentences imposed upon him for robbery and assault constituted multiple punishment in violation of section 654, but he has abandoned this contention in his closing brief.

husband, who was in Los Angeles. Marilyn was then brought out to the hall and ordered to sit on the floor next to Dr. and Mrs. Riskin. At this time the man with the knife, who had meanwhile put a mask on his face, told the Riskins that his companion was dangerous and in need of "a fix" and asked them if they had any morphine.

The men then asked where the money and the jewels were, Mrs. Riskin responding that they were upstairs in the bedroom. However, when the man with a gun pointed his gun at Marilyn and asked her to go upstairs and show him the money and jewels Mrs. Riskin interjected that since it was her house and she knew where everything was she would go. Mrs. Riskin then arose and started up the stairs behind the man with the gun. Part way up the stairs Mrs. Riskin turned around and looked down at her husband and daughter-in-law and the man standing over them with a knife. However, when the man with the gun waved his gun and said "Come on, come on," Mrs. Riskin proceeded up the stairs and into the bedroom.

Once in the bedroom the man with the gun took some items from Dr. Riskin's trousers, including a small pocket knife, a watch, keys, and some bills from a wallet. The man then put these items in his pockets and he and Mrs. Riskin went downstairs to the dinette, where the man took some change from Mrs. Riskin's purse. The two then proceeded to the living room where the man continued his search for valuables. He then took Mrs. Riskin back to the entry hall and ordered her to sit on the floor with her husband and daughter-in-law.

At this time Officers Frank Kerlin and Burt Olson of the San Francisco Police Department, who had received a call in their radio car that there was a burglary in progress at 120 Belgrave,[3] arrived at the Riskin residence and demanded entrance. When Marilyn opened the front door after being admonished by one of the men not to do so, the officers entered the hallway of the Riskin house. Upon entering, Kerlin saw Dr. and Mrs. Riskin lying on the floor. In addition Kerlin saw a man standing in a doorway on the side of the hall. This man was wearing a blackish-green jacket with wooden buttons and had a hood over his head. As he saw the officers he dropped the knife he was carrying and ran through the door. At this

[3] Steve Riskin, Marilyn's husband, testified that while he was talking by telephone to Marilyn shortly before 10 p.m. on May 19, 1965 his wife informed him that a robbery was taking place at the Riskin residence; and that he then called the San Francisco Police Department and reported the robbery.

point Mrs. Riskin shouted "He has got a gun. . . . He will kill you." Kerlin, however, followed the man through the doorway which led to the outside of the house. As Kerlin rounded the doorway he saw the man at the foot of the stairs. At this time the man had pulled the hood off his head and looked back at Kerlin, who observed that the man was a Negro with a thick growth or shadow beneath his nostrils. Kerlin shouted to the man to halt. However, the man ran through the trees. Kerlin then pursued the man in his police car, but although he observed the suspect running, he lost the man in the vicinity of Shrader and Alma Streets.

At this point Kerlin was joined in his search by Officers Clark and Gerrans, who had heard Kerlin's report to communications that he was in pursuit of a robbery suspect. Shortly thereafter Gerrans discovered defendant hiding in the bushes in the yard at 1241 Shrader. Although defendant emerged from the bushes upon Gerrans' command, as he did so he lunged at Gerrans with a knife, thereby cutting Gerrans' hand. A scuffle between Gerrans and defendant then ensued. However, when Clark arrived on the scene, the two officers were able to subdue defendant. Defendant was then taken to the police car where, based upon the fact that he was a Negro, had a thick mustache underneath his nostrils, and was wearing a greenish-black jacket with toggle buttons, Kerlin identified defendant as the man whom Kerlin had observed on the stairway at the Riskin home.

Various items of jewelry which were identified at the trial as belonging to the Riskins were found by the police on defendant's person at the time of the arrest and in the back seat of the police car in which defendant was transported after his arrest. These items were introduced into evidence as was a loaded gun which was found by Bradley Thomas in his yard at 1241 Shrader Street on the day after the robbery. Also introduced into evidence was a .38 caliber Colt bullet casing which was found in an attache case in defendant's hotel room on May 20, 1965 by Inspector Emile Dutil of the San Francisco Police Department. Charles Fontan, a criminologist in the San Francisco crime laboratory, testified that in his opinion the bullet casing had been fired by the gun found in the yard at 1241 Shrader Street.

Defendant was the only witness for the defense. He testified that he had never been in the Riskin home; that he was in the vicinity of their home because he was supposed to meet a man named James Benson in a bar on Carl Street; that as he was

looking for Benson, a man ran past him and threw a coat on the ground; that because this coat was better than defendant's, defendant picked it up; that he then went into the yard at Shrader Street where he took off his own jacket and tried on the coat he had found; that he felt a gun in the coat pocket, took it out and threw it in the bushes; that when he heard cars approaching he became scared and hid in the bushes; that when a flashlight was pointed at him he came out of the bushes; that the officers who apprehended him made him kneel down and pushed his face in the mud; and that they also struck him in the mouth, causing the wire in his false teeth to break and to cut his mouth and the hand of one of the officers. Finally defendant testified that the officers hit him several times both in the yard and at the police station.[4]

### Alleged Illegal Search and Seizure

Defendant contends that the bullet casing which was found in his hotel room by Inspector Dutil was obtained as a result of an illegal search and seizure and was therefore improperly admitted into evidence. The evidence which was elicited at the hearing on defendant's motion for new trial[5] concerning the propriety of this search was as follows: Patrick Smythe testified that as a parole agent employed by the California Department of Corrections he was assigned to the Special Service Unit of the department, which provided special parole agents for parolees who have a high potential for violence; that on May 20, 1965 defendant, who was on parole and had a personal parole officer other than Smythe, was classified as a Departmental Interest Case and thus came

---

[4]At the trial it was stipulated by counsel in the presence of the jury that for the purpose of the count charging possession of a firearm by a convicted felon defendant had been convicted of robbery in 1945. Further, a certified copy of the judgment with regard to this conviction was introduced into evidence.

[5]At the time the bullet casing was introduced into evidence defendant objected to its admissibility on the ground that his constitutional rights had been violated. However, the People having made an offer of proof that Dutil went to defendant's hotel room with a parole officer, the trial court ruled that the bullet casing was admissible on the basis that defendant's status as a parolee justified entry into his hotel room. Subsequently, as grounds for a new trial, defendant again urged the inadmissibility of the bullet casing on the dual basis that there was never any evidence introduced at the trial to the effect that Dutil entered defendant's room with the authority or permission of a parole officer and that even if evidence to this effect had been produced, Dutil's entry into defendant's room was illegal. In order to rule properly on defendant's motion for a new trial, the court at this time took evidence on the propriety of the search of defendant's room.

within the jurisdiction of the Special Service Unit and of Smythe; that on May 20, 1965 Smythe was in the burglary detail of the San Francisco Police Department on a matter unrelated to the instant case and while there received information that defendant had been taken into custody; that based upon the police report which Smythe received, he notified the office of the Director of Corrections and defendant's personal parole officer that defendant had been arrested; that since the police report indicated that two persons had been involved in the offense, it became Smyth's duty to conduct a special investigation to determine if other men under the department's jurisdiction had been involved in the offense; that in addition Smythe was concerned with whether defendant had violated his parole and also, because of defendant's aggressive profile, whether he had any weapons; that accordingly, Smythe, accompanied by Dutil, went to defendant's hotel room; that while Smythe was searching the closet and bureau drawer, Dutil opened a black attache case which was lying on the bed; and that the spent cartridge case was found in the attache case.

Dutil testified that after Smythe read the police report concerning defendant's arrest, the two discussed the case; that Smythe then indicated that he was going to defendant's room and asked Dutil if he wished to go along; and that Dutil then accompanied Smythe to defendant's room where Dutil found the bullet casing.

Although the trial court upheld the search of defendant's room based on the fact that defendant was a parolee at the time, defendant contends that the ''parolee exception'' to the general principle that probable cause is required to validate a search without a warrant should not be applicable to a search of a parolee's premises after he has been taken into custody nor in fact to any search of a parolee's residence, and that the exception should not justify a search either by a police officer who accompanies the parole officer or by a parole officer other than the parolee's personal parole officer. Before proceeding to consider these specific contentions we deem it proper to discuss the rules of law pertinent to the search of parolees' premises.

█ It is well established that although a parolee is entitled to basic rights entitling him to constitutional protection against arbitrary or oppressive official action (see *In re Jones,* 57 Cal.2d 860, 862 [22 Cal.Rptr. 478, 372 P.2d 310] and cases there cited; and see *Brown* v. *Kearney,* 355 F.2d

199, 200; *Martin* v. *United States,* 183 F.2d 436, 439; *United States* v. *Hallman,* 365 F.2d 289, 291) these rights are not necessarily tested by the same rules which apply to citizens who are possessed of full civil rights. (*People* v. *Hernandez,* 229 Cal.App.2d 143, 149-150 [40 Cal.Rptr. 100]; *People* v. *Denne,* 141 Cal.App.2d 499, 507-510 [297 P.2d 451]; *People* v. *Quilon,* 245 Cal.App.2d 624, 626 [54 Cal.Rptr. 294].)

The rationale underlying this principle is that a parolee is at all times in *custodia legis.* Although he is not a prison inmate in the physical sense, he is serving the remainder of his term outside rather than within the prison walls. (*People* v. *Quilon, supra; People* v. *Hernandez, supra.*) Accordingly, so far as necessary for the maintenance of parole guardianship, the status of a parolee as a prisoner is no different than that of one who remains in confinement, and, therefore, for the purpose of maintaining the restraints and social safeguards accompanying such status, the correctional authorities who supervise the parolee on parole may subject him, his home and his effects to such constant or occasional inspection and search as may seem advisable to them. (*People* v. *Hernandez, supra; People* v. *Quilon, supra; People* v. *Denne, supra; People* v. *Triche,* 148 Cal.App.2d 198, 202-203 [306 P.2d 616]; *People* v. *Robarge,* 151 Cal.App.2d 660, 665-666 [312 P.2d 70].)

In the light of the foregoing it has been held that a parole officer needs neither a search warrant nor consent of a parolee in order to search the latter's premises (*People* v. *Denne, supra; People* v. *Triche, supra; People* v. *Gastelum,* 237 Cal.App.2d 205, 208-209 [46 Cal.Rptr. 743]; *People* v. *Quilon, supra*), nor is he bound by the requirement of reasonable or probable cause in conducting a search. (*People* v. *Hernandez, supra,* pp. 150-151); *People* v. *Quilon, supra,* p. 627.) The fact that a person is on parole does not, however, justify a search by peace officers other than parole officers. (*People* v. *Quilon, supra;* see *People* v. *Gallegos,* 62 Cal.2d 176 [41 Cal.Rptr. 590, 397 P.2d 174].) But when a parole officer is justified in making a search he may enlist the assistance of ordinary peace officers. (*People* v. *Quilon, supra; People* v. *Contreras,* 154 Cal.App.2d 321, 326 [315 P.2d 916]; see *People* v. *Hernandez, supra; People* v. *Triche, supra.*)

Turning to the instant case we conclude that the specific contentions made by defendant have been answered by the cases which have applied the rules above set out. (As to search of a parolee's residence, see *People* v. *Gastelum, supra,*

p. 208; *People* v. *Contreras, supra,* p. 325; *People* v. *Triche, supra,* p. 202; as to search after parolee has been taken into custody, see *People* v. *Gastelum, supra,* p. 208; as to legality of search by parole officer when accompanied by a police officer, see *People* v. *Gastelum, supra; People* v. *Giles,* 233 Cal.App.2d 643, 646 [43 Cal.Rptr. 758]; *People* v. *Quilon, supra; People* v. *Contreras, supra,* p. 326.) We find no merit, moreover, in the contention that the search was not justified because Smythe was not defendant's personal parole officer. The record discloses that Smythe, as an employee of the Department of Corrections, was a member of a special unit which had jurisdiction over defendant because of his potential for violence; and that Smythe, in conducting a search of defendant's hotel room, was acting in line with department procedures and on behalf of the department and the Special Service Unit. Thus since the Department of Corrections has the authority to establish the rules, regulations and procedures deemed best suited to carry out the parole system and since Smythe's search of defendant's room was conducted on behalf of the department and pursuant to these rules and regulations, it is clear that this search was made within the aegis of the rules applicable to parolees hereinabove discussed.

## Insufficiency of the Evidence

Defendant contends that the evidence is insufficient to support the verdict as to all counts except that charging him with assault in violation of section 245, subdivision (b). In addition he argues in relation to the charge of a violation of section 12021 that the trial court erred in denying his motion under section 995 to dismiss the indictment as to this charge.[6] ■ Before proceeding to a consideration of the evidence in support of the various convictions involved in this case we note that our determination of the issues raised by defendant in relation to the sufficiency of the evidence must be guided by the principle enunciated in the case of *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], to the effect that a reviewing court cannot weigh the evidence but must instead assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and must then determine whether such facts are sufficient to support the verdict. In the light of this rule we conclude that the evidence was

[6] An order denying a motion to dismiss under section 995 is reviewable on appeal from the judgment of conviction. (*People* v. *Elliot,* 54 Cal.2d 498, 503 [6 Cal.Rptr. 753, 354 P.2d 225].)

sufficient to support the verdict as to the challenged counts upon the following analysis of the evidence.

 As to defendant's conviction for robbery of Dr. and Mrs. Riskin and kidnap of Mrs. Riskin for the purpose of committing robbery, he contends that the evidence in the record is insufficient to show that defendant was one of the bandits in the Riskin house. In response to this contention it suffices to note the following evidence: Kerlin's identification of defendant as the man whom he had seen leaving the Riskin's residence; the fact that the clothes defendant was wearing when he was apprehended matched the description given by the Riskins of the clothes worn by the bandit with a gun; and the fact that various items belonging to the Riskins were found on defendant's person and in his clothes when he was apprehended. Defendant contends, however, that Kerlin's identification of defendant as the man involved in the Riskin robbery was discredited. The basis of this contention is that although Kerlin testified that the man who ran from the Riskin house had a thick growth or shadow beneath his nostrils, a photograph of defendant taken on May 20, 1965 shows him with a pencil-thin mustache. Despite this apparent discrepancy between Kerlin's description of the robber and the photograph of defendant, the fact remains that immediately after defendant's apprehension he was identified by Kerlin as one of the men at the Riskin house. The strength of this identification in light of the photograph of defendant which was introduced into evidence was clearly a determination to be made by the jury. (*People* v. *Primo*, 121 Cal.App.2d 466, 468 [263 P.2d 443]; *People* v. *Addington*, 43 Cal.App.2d 591, 593 [111 P.2d 356].) On appeal we must assume that the jury believed Kerlin's identification of defendant as the man he had seen leaving the Riskin residence.

 Turning now to the claim made by defendant as to the insufficiency of the evidence to support defendant's conviction on the charge of kidnaping to commit robbery, we note that he argues that Mrs. Riskin moved voluntarily and that therefore her movement was not without free will and consent and thus not a kidnap under either section 207 or 209.[7] In support of this argument defendant refers to the fact that

---

[7]Kidnaping is defined in section 207 as follows: "Every person who forcibly . . . takes . . . any person in this state, and carries him . . . into another part of the same county . . . is guilty of kidnaping." Section 209 provides for an increased punishment for "any person who kidnaps or carries away any individual to commit robbery. . . ."

when the bandits asked Marilyn to take them upstairs to the money and jewels, Mrs. Riskin stated that she would go and then proceeded to follow one of the men upstairs. Defendant, however, overlooks the testimony of Mrs. Riskin to the effect that after she had gone part way up the stairs she turned around and looked at her husband and daughter-in-law, at which point the man with the gun waved his gun and said "Come on, come on," causing Mrs. Riskin to continue up the stairs. This testimony is susceptible to the inference that Mrs. Riskin's ascent up the stairs was actuated by fear and that her fears were justified. ■ As stated in *People* v. *Dagampat*, 167 Cal.App.2d 492, 495 [334 P.2d 581], "The gravaman of the offense of kidnaping is some form of compulsion. [Citation.] The requisite force or compulsion need not consist of the use of actual physical force or of express threats; the taking is forcible where it is accomplished through the giving of orders where the victim feels compelled to obey because he fears harm or injury from the accused, and his apprehension is not unreasonable under the circumstances. [Citations.]" (See also *People* v. *De Georgio*, 185 Cal.App.2d 413, 422 [8 Cal.Rptr. 295].)[8]

■ With regard to the conviction for possession of a firearm in violation of section 12021, defendant argues that the momentary possession of a gun which was admitted by defendant should not constitute the requisite possession to support a conviction under this section, and that since the circumstantial evidence of defendant's possession of the gun was discredited, there is not substantial evidence to support defendant's conviction on this charge. As to the latter point defendant refers again to the discrepancy between Kerlin's description of the man whom he saw leaving the Riskin house and the photograph taken of defendant on May 20, 1965. Also defendant contends that someone other than defendant must have been in possession of the attache case in which Dutil found the bullet casing in defendant's hotel room, since if it had been there when Officer Sullivan searched the room on the previous evening "he would have seen it and most likely have inspected it." We have already stated that the strength of Kerlin's identification of defendant as the man whom he previously saw leaving the Riskin house is to be determined

---

[8]In addition to urging insufficiency of the evidence to support his conviction for a violation of section 209, defendant contends that this section is unconstitutional. The constitutionality of this section has, however, been upheld in *People* v. *Wein*, 50 Cal.2d 383, 400 [326 P.2d 457], and *People* v. *Norman*, 177 Cal.App.2d 59, 66 [1 Cal.Rptr. 699].

by the jury. Similarly the question of whether the attache case containing the bullet casing belonged to defendant or was put in defendant's hotel room by someone else was also for the jury's determination. This court must assume that the jury resolved these questions against defendant and in favor of the verdict. Thus defendant's conviction for possession of a firearm is supported not only by the same evidence which tended to show that defendant was the man who carried a gun during the robbery at the Riskin house and by the fact that a gun was found at the spot where defendant was ultimately apprehended by the police, but also by the fact that, according to the criminologist, the bullet casing which was found in defendant's hotel room was fired by the gun found in the yard at 1241 Shrader Street. Moreover, since these pieces of evidence support an inference that defendant was the man in the toggle coat who held a gun during the robbery of the Riskins we need not consider whether a momentary possession of a gun in the manner testified to by defendant would support a conviction under section 12021.

Adverting to defendant's contention that in response to his motion pursuant to section 995, the charge of a violation of section 12021 should have been dismissed from the indictment because the evidence submitted to the grand jury did not show probable cause to return an indictment as to this charge, it suffices to say that since all of the evidence which we have outlined above as constituting substantial evidence in support of defendant's conviction for possession of a firearm was presented at the grand jury hearing as well as at the trial, it is apparent that the grand jury had probable cause to return an indictment charging defendant with a violation of section 12021.

### Alleged Errors in Instructing the Jury

Defendant's first contention concerning error in the giving of instructions is that the trial court should have instructed that voluntary movement by the victim is a defense to a charge of kidnaping to commit robbery. The record does not indicate that such an instruction was requested. However, defendant argues that the trial court was required to give such an instruction on its own motion. With regard to the duty of the trial court to so instruct, the law is clear that the court is required on its motion to give instructions on the general principles of law governing the case. (*People* v. *Morse*, 60 Cal.2d 631, 656 [36 Cal.Rptr. 201, 388 P.2d 33, 12

A.L.R.3d 810]; *People v. Wade,* 53 Cal.2d 322, 334 [1 Cal. Rptr. 683, 348 P.2d 116].)　　In the instant case the trial court adequately discharged this duty by giving an instruction which defined kidnaping for the purpose of committing robbery in terms of "a carrying or a forcible moving for some distance of a person who, *against his or her will,* is taken into the custody or control of another person, . . ." (Italics added.)

Defendant's second contention concerning error in the instructions is that the trial court failed to admonish the jury that they were to disregard a newspaper clipping which, although marked for identification, was subsequently ruled inadmissible as evidence and that the court further failed to admonish the jury to disregard statements of the prosecutor and testimony of a witness concerning this clipping. The statements of the prosecutor to which defendant has reference occurred at the commencement of the trial. In her opening statement the prosecutor first stated that Mrs. Riskin would testify that she had made an attempt on her life and that her attempted suicide had been the subject of a newspaper article. Subsequently the prosecutor stated that Officer Sullivan would testify that he went to defendant's hotel room; that he found a newspaper clipping concerning Mrs. Riskin's suicide attempt; that the clipping gave the Riskin's address; and that written at the top of the clipping were the words "Near Haight and Stanyan." During the examination of Mrs. Riskin the newspaper clipping was marked for identification. At this time Mrs. Riskin confirmed that the clipping concerned her and further testified that the handwriting referring to Haight and Stanyan was neither hers nor her husband's. No objection was made by defense counsel to either of these references to the newspaper clipping. However, when Officer Sullivan testified that he and another officer had gone to defendant's hotel room at approximately 11 p.m. on May 19, 1965, defendant objected to any further testimony of the officer on the ground that an illegal search had been made. At this point the jury was excused and a *voir dire* examination conducted. The trial then ruled that no evidence concerning the newspaper clipping could come in. Accordingly, no further mention of the clipping was made during the trial.[9]

---

[9]Although at the conclusion of the People's case People's Exhibits One through Fifteen, previously marked for identification, were admitted into evidence on motion of the prosecution, it is clear that the newspaper clipping, which had been marked as People's One, was not intended to be included in the group of exhibits which were admitted into evidence.

As to defendant's contention that the trial court should have admonished the jury to disregard the clipping, the record reveals that the trial court, both before and after the presentation of evidence, made numerous admonitions to the jury to the effect that they were to disregard any evidence which, although initially admitted, was ultimately stricken from the record. Similar admonitions to the effect that the jury was to disregard statement of counsel were also given.

And finally, as to defendant's contention that the jury should have been instructed to disregard the testimony of Mrs. Riskin concerning the newspaper clipping, since no objection was made to this testimony nor was a motion made to strike it, the trial court was under no obligation to admonish the jury to disregard this testimony.

### Comment By the Trial Court

While instructing the jury, the trial court made a comment to the effect that in its opinion, based on the evidence, defendant's guilt on each charge of the indictment had been proved beyond a reasonable doubt. In addition the trial court admonished the jury that the court's opinion as to defendant's guilt was in no way binding upon the jury, whose province it was to resolve all questions of fact and determine the credibility of the witnesses.[10] The giving of an

---

Thus, we note the statement of the trial court, made following jury instructions and out of the presence of the jury, that "The record will show that exhibit marked People's 1 will not be taken to the Jury Room."

[10] The exact comment made by the trial court is as follows: "By the constitution of this state, a Judge of this Court presiding at the trial of a criminal action is authorized, within proper bounds, to comment on the evidence and testimony and the credibility of any witness.

"It is the opinion of this court based upon the evidence in this case that the defendant, Leonard Thompson, has been proved beyond a reasonable doubt to be guilty of each of the charges of the indictment. The charges of the indictment, now, are Count One, charges him with kidnapping to commit robbery, a violation of 209 of the Penal Code; Counts Two and Three charge the defendant with robbery against Mrs. Riskin and Dr. Riskin, respectively. Count Four charges the defendant with an assault with a deadly weapon upon a peace officer, and Count Five charges him with possession of a firearm capable of being concealed upon the person while at a time when the defendant had been previously convicted of a felony. Now, I caution you that it is your right and your duty to exercise the same independence of judgment in weighing my comment on the evidence as you are entitled to exercise in weighing the testimony of any witness and the arguments of counsel.

"You will keep in mind that you are the exclusive judges of the credibility of the witnesses and of all questions of fact submitted to you. Such authority as the trial judge has to express his personal thoughts on any of these matters is confined to the sole purpose in aiding you in arriving at a verdict and may not be used, and is not used in this case, to impose his will upon you or to compel a verdict."

identical comment was held to be erroneous and to constitute prejudicial error in the recently-decided case of *People* v. *Brock*, 66 Cal.2d 645, 649 and 655 [58 Cal.Rptr. 321, 426 P.2d 889] upon the rationale that such an instruction prevented the jury from properly considering the case in that it provided ''for the jury a means to avoid the preliminary determinations called for by the instructions of the law and instead to rely on the words of the judge in returning a conviction.'' (P. 651.)

### *Denial of Effective Assistance of Counsel*

Defendant argues that he was denied the effective assistance of counsel, but as we understand this argument he does not contend that the errors alleged to have been made by counsel were sufficient to reduce the trial to a farce or a sham. Rather he argues that a denial of the right to effective assistance of counsel should be held to exist ''where it can be said that in absence of the errors, omissions, or other adverse tactics of counsel, it is reasonably possible that a more favorable result would have been obtained.'' The law, of course, is clear that a defendant has not been denied the effective assistance of counsel as guaranteed by the Constitution except in cases where counsel's lack of diligence or competence reduces the trial to a farce or a sham. (*People* v. *Reeves*, 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35] ; *People* v. *Jolke*, 242 Cal.App.2d 132, 140 [51 Cal.Rptr. 171].) Moreover, defendant has the burden of establishing his claim of ineffective assistance of counsel as demonstrable reality, not as a matter of speculation. (*People* v. *Reeves, supra,* at p. 774.)

In support of his argument that he was denied effective assistance of counsel defendant cites the following examples: (1) The failure to question Bradley Thomas concerning the knife used to assault Gerrans; (2) the failure to argue to the jury that Mrs. Riskin consented to accompany the bandit upstairs in her house; and (3) the failure to request an instruction on consent as a defense to the section 209 violation. We deem it unnecessary to discuss each of these points individually because, while in the light of hindsight it might have been advantageous for defense counsel to have pursued such avenues of questioning and argument and to have requested the referred-to-instructions, the failure to do so in no way reduced defendant's trial to a farce or sham. Moreover, our examination of the record reveals that defendant was vigorously and competently represented by counsel.

We conclude, therefore, that there is no merit to defendant's argument that he was denied the effective assistance of counsel.

### Conclusion

A recapitulation of the foregoing discloses no error excepting that involving the trial court's comment on defendant's guilt. In *Brock, supra,* the Supreme Court, although holding that the error there constituted prejudicial error, recognized that a comment on guilt is not necessarily prejudicial per se. We refer to the Supreme Court's application of the California harmless-error rule in reaching this conclusion upon the basis that the evidence was not overwhelming. It is thus apparent that the Supreme Court not only deemed that such error did not violate any federal constitutional right, but also declined to follow the more rigid federal rule that it is improper for a trial judge to state that he believes the defendant guilty, unless the undisputed evidence establishes guilt.[11] (See *United States* v. *Murdock,* 290 U.S. 389, 393-394 [78 L.Ed. 381, 384, 54 S.Ct. 223]; *United States* v. *Woods,* 252 F.2d 334, 336 [and cases cited].)

Although the evidence in the instant case was essentially circumstantial, we deem it to be overwhelming. In our opinion the evidence presented by the prosecution, when weighed against the defendant's defense which consisted solely of his own tenuous testimony as to his presence in the vicinity of the Riskin home immediately after the robbery and his possession of the gun in question, is tantamount to evidence which undisputably establishes defendant's guilt. Accordingly, notwithstanding the erroneous comment on guilt, we conclude, upon an examination of the record in this case, that it cannot be said that there was a miscarriage of justice, since it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 13.)

The judgment is affirmed.

Sims, J., and Taylor, J.,* concurred.

---

[11]The Supreme Court in *People* v. *Brock, supra,* 66 Cal.2d 645, approved our decision in *People* v. *Williams,* 235 Cal.App.2d 389, 402-403 [45 Cal.Rptr. 427], wherein we upheld a comment on guilt, on the basis that the comment in *Williams* was made in accordance with the federal rule.

*Assigned by the Chairman of the Judicial Council.

A petition for a rehearing was denied July 20, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1967. Peters, J., was of the opinion that the petition should be granted.