[Crim. No. 13663.    Second Dist., Div. Five.    June 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. TERRY LEE CLARK, Defendant and Appellant.

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant was convicted of possession of marijuana. (Health & Saf. Code § 11530.) He appeals. In 1965 defendant had been convicted of possession of narcotics. Criminal proceedings in that case were suspended and he was sent to the California Rehabilitation Center at Corona. Later he was placed in outpatient status subject to the supervision of a parole agent. One of the conditions of defendant's release was that he submit to Nalline tests when requested to do so.

Defendant's parole agent, Gerald Dashkin, saw him at an outpatients' group meeting on October 17, 1966, at 7:30 p.m. and requested him to take a Nalline test. Defendant testified that he proceeded to the test center, arriving shortly before 8 p.m., and was refused permission to take the test at that time. The center closed at 8 p.m. Defendant called Dashkin's office the following day, Dashkin was out, but defendant left a message with the agent's secretary to the effect that he had been unable to take the test and wanted to be rescheduled.

On the morning of October 19, 1966, Dashkin received a list from the testing center of all the people who had taken the Nalline test on October 17. Defendant's name was not on it. Dashkin had noticed a suspicious mark on defendant's arm some time before October 17. He had questioned defendant

about it and defendant had denied using drugs. Dashkin phoned defendant's employer and learned defendant had not reported for work on October 19. Dashkin thereupon decided to arrest defendant and return him to the custody of the Narcotic Addiction Evaluation Authority pursuant to section 3151 of the Welfare and Institutions Code. For that purpose Dashkin, in the company of another parole agent, went to defendant's residence after noon on October 19. He had no search warrant.

Upon entering defendant's apartment Dashkin proceeded through the living room to the dining area where he found a "green medicine bottle"[1] in plain view. Dashkin then went into the bedroom where he found a 16-year-old boy asleep. Dashkin returned to the living room, informed defendant he was under arrest for parole violation and handcuffed him. At this point defendant's wife returned to the apartment. According to defendant's testimony, which is unrefuted, as his wife began to open the door, Dashkin grabbed her and told her to be seated and remain seated. Then Dashkin returned to the bedrrom, brought out the boy and told him to be seated and remain. Dashkin again returned to the bedroom and came back with a coat.

The only versions before the trial court as to what happened then, was defendant's. ". . . He began questioning my wife about it in a very brutal manner, having her pinned in a seat where she couldn't move from the seat, shaking the coat in front of her, screaming at her and causing her to go into hysterics. . . . He was shaking the coat in front of her and asking her if it was her coat. Q. Did she acknowledge that it was her coat? After several minutes, yes. Q. Then what did he do? A. Then he reached into the pocket and withdrew a bottle and another article, which I couldn't really see, and began shaking that at her and asking her if it was hers. Q. . . . Was she crying? A. She was crying. At the time the event took place my wife was under doctor's care for a recent accident. She was crying to a point of hysterics. Q. Was it at this time that you said something to him? A. Yes. At this time I told him it belonged to me and that everything belonged to me in order to get him to leave her alone. Q. In truth and in fact did you have any knowledge that the stuff that he took out of her coat was even in the house? A. No,

[1]Defendant testified it was a Bufferin bottle. This is not denied.

I didn't. Q. You did it solely because of her panic and fear? A. Yes." The jacket contained marijuana.[2]

After the defendant's confession, Dashkin asked the other agent to call for police assistance because of the unexpected presence of the two additional people in the apartment. Two officers answered the call for assistance.

On cross-examination, defendant testified: "Q. You not only told Mr. Dashkin that the marijuana was yours but you later told the two policemen that it was yours, too, didn't you? A. I did."

The People made no effort to show how much later and under what circumstances defendant made this second confession.

Although the record indicates that defendant was advised of his right to counsel and to remain silent upon his arrest, it is silent as to whether any such warnings were given to his wife who, according to Dashkin's testimony, was also in custody at the time the defendant confessed.

■ Defendant argues that his confession was coerced and therefore inadmissible.

The Attorney General, in opposing this contention, does not rely on the fact that no objection on that ground was made below. It would be futile to do so. (*In re Cameron,* 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633].)

The Attorney General claims that defendant's confession was "unsolicited," given after an appropriate *Miranda* [384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)] warning and not coerced by a promise to release a relative under arrest or a threat to make such an arrest, as had been the case in the authorities relied on by defendant. (*People* v. *Trout,* 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Manriquez,* 231 Cal.App.2d 725, 730 [42 Cal.Rptr. 157]; *People* v. *Rand,* 202 Cal.App.2d 668, 673, 674 [21 Cal.Rptr. 89]; *People* v. *Mellus,* 134 Cal.App. 219, 223 [25 P.2d 237].) We are also referred to the rule that "hopes that [defendant's] confession may result in the exoneration of others does not render a confession involuntary as a matter of law." (*People* v. *Kendrick,* 56 Cal.2d 71, 86 [14 Cal.Rptr. 13, 363 P.2d 13].)

It may well be that when Dashkin was badgering defendant's wife he was not soliciting a confession from defendant, yet the question is not what the officer was shooting at, but

---

[2]The jacket also contained amphetamine for possession of which defendant was not prosecuted.

what he hit. If, as appears without contradiction, defendant's free will was overborne by the officer's conduct, his statement is inadmissible. (*Rogers* v. *Richmond,* 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735].)

Nor can it make any difference that defendant had been advised of his constitutional rights. It cannot be seriously argued that such advice immunizes law enforcement officers from the legal effect of later coercive practices.

As far as the factul distinction between the case at bar and the *Trout-Manriquez-Rand-Mellus* line of cases is concerned, it is of course true that in each of those cases a near relative was under actual or threatened arrest and that a promise to spare the relative was the inducement for the confession. This cannot mean, however, that under similar circumstances a confession is deemed coerced only if precisely the same form of coercion is employed.

██ "Before a confession may be used against a defendant the prosecution has the burden of showing that it was voluntary and was not the result of any form of compulsion or promise of reward, and it is immaterial whether the pressure or inducement was physical or mental and *whether it was express or implied.*" (*People* v. *Trout,* 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]. Italics ours.)

██ Nor can we apply the rule stated in *People* v. *Kendrick, supra.* What, according to defendant, induced his confession was not just the hope of exonerating his wife, but the mental torture she appeared to be suffering.

Again we point out that defendant's testimony was uncontradicted. It was, of course, the People's burden to show voluntariness. (*People* v. *Berve,* 51 Cal.2d 286, 291 [332 P.2d 97].) The only attempt to do so was a question asked of Dashkin at the outset of the trial, whether defendant made his statement "freely and voluntarily." The officer said that it was so made. After defendant had testified, nothing further was offered. At the trial both sides and the court were totally occupied with the legality of the search and seizure discussed later in this opinion, but in the field of coerced confessions there is a duty on the court, as well as on counsel, to see that all the constitutional t's are crossed. (*In re Cameron, supra*; *People* v. *Matteson,* 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Underwood,* 61 Cal.2d 113, 126 [37 Cal. Rptr. 313, 389 P.2d 937]; *People* v. *Millum,* 42 Cal.2d 524, 526-527 [267 P.2d 1039].) In the light of defendant's uncon-

tradicted testimony, the officer's conclusion that the confession was voluntary was insufficient to support its admissibility. (*People* v. *Matteson,* 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Berve,* 51 Cal.2d 286, 290 [332 P.2d 97].)

With respect to the second confession, the People obviously did not carry the burden of dispelling the presumption "that the improper influence continue[d] to act." (*People* v. *Brommel,* 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Jones,* 24 Cal.2d 601, 604 [150 P.2d 801].)

Because the issue will arise on retrial, we must resolve defendant's contention that the search of his apartment which turned up the marijuana was illegal and the evidence, therefore, inadmissible.

The People argue that the rules regulating searches and seizures conducted by parole officers generally are applicable to defendant. They rely on *People* v. *Hernandez,* 229 Cal.App. 2d 143 [40 Cal.Rptr. 100], for the proposition that a warrantless search by a parole agent of the person or premises of a parolee is permissible even absent probable cause. *Hernandez,* however, dealt with a criminal parolee. The civil rights of such parolees are suspended pursuant to section 2600 of the Penal Code.

To what extent the parolee's suspension of civil rights was necessary to the *Hernandez* result is hard to say. An answer to the question would be important in the case at bar if Dashkin did not have probable cause to believe that defendant had committed a crime, because outpatients from Corona, by express provision in section 3151 of the Welfare and Institutions Code, are not subject to the suspension of civil rights imposed upon parolees from state prison by section 2600 of the Penal Code; but we think that Dashkin had probable cause to believe that defendant, at the time and place of his arrest, was in possession of narcotics.

In *People* v. *Carrillo,* 64 Cal.2d 387 [50 Cal.Rptr. 185, 412 P.2d 377], the court dealt with a prison parolee who had a prior narcotic conviction and had missed a Nalline test. The court held that these two factors gave his parole agent probable cause to arrest him for present possession of narcotics. We do not believe that from the point of view of probable cause, it makes a difference whether, after the first conviction, a defendant had been sent to prison or to Corona. Thus the facts that defendant was an outpatient after a prior narcotics conviction, had missed his Nalline test, had several days

previously appeared to have a suspicious mark on his arm and had failed to report for work on October 19, gave Dashkin probable cause to arrest defendant for present possession of narcotics. As as incident to such an arrest, Dashkin, as the arresting officer,[3] had a right to search the person of the defendant and so much of the premises as were subject to his control. (*United States* v. *Rabinowitz,* 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430]; *People* v. *Winston,* 46 Cal.2d 151, 162-163 [293 P.2d 40].)

One final technical matter: defendant appealed from the "judgment" and an order denying him a new trial. Through clerical error the court's statement that proceedings were suspended was not reflected in the clerk's transcript, which shows a sentence to prison for the term prescribed by law and a statement that "Defendant remains committed to Department of Correction [*sic*] under NDA case #6590." There never has been a judgment in this case and the purported appeal therefrom must be and hereby is dismissed.

The order denying a new trial is reversed.

Hufstedler, J., and Stephens, J., concurred.

---

[3]Section 817 of the Penal Code includes parole agents in the definition of peace officers.