[Crim. No. 6244.   First Dist., Div. Two.   Mar. 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES DAVIS, Defendant and Appellant.

James Davis, in pro. per., and J. A. Morales, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and James B. Cuneo, Deputy Attorneys General, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendant James Davis appeals from a judgment convicting him of first degree robbery and assault with intent to commit murder. ▊ Defendant raises but one argument on appeal: that the trial court, while instructing the jury, made a comment[1] of the character which was held erroneous and prejudicial in *People* v. *Brock* (1967) 66 Cal.2d 645 [58 Cal.Rptr. 321, 426 P.2d 889]. Since the trial

---

[1] *"It is the opinion of this Court, based on the evidence, that the guilt of the defendant Sam Brock as to both of the offenses here charged, has been established beyond a reasonable doubt."* (*People* v. *Brock* (1967) 66 Cal.2d 645, 649 [58 Cal.Rptr. 321, 426 P.2d 889].)

court's comment[2] was almost identical to that disapproved in *Brock*, the sole question before this court is whether such error was prejudicial or harmless in the light of the record as a whole. (*People v. Thompson* (1967) 252 Cal.App.2d 76, 91-92, 93 [60 Cal.Rptr. 203]; *People* v. *George*, 259 Cal.App. 2d 424 [66 Cal.Rptr. 442] 1 Crim. 5380 decided February 26, 1968.

The facts are without dispute. Anne Enz testified that at approximately 1:30 or 2 p.m. on the afternoon of August 12, 1966, she was in the restaurant which was owned by herself and her husband, located on Larkin Street in San Francisco; that she was alone in the restaurant when she glanced through the window and saw the defendant walk past the window, walking all over the sidewalk, like he was drunk. She thought of locking the door of the restaurant but discarded the idea when defendant walked on past.

Shortly thereafter, the defendant entered the restaurant and ordered bacon and eggs. Since Mrs. Enz was somewhat afraid of him, she told him that breakfast was no longer being served. He then examined a menu and ordered a hamburger steak. Mrs. Enz thought he was drunk or something and thought she would humor him, so she served him some soup, bread and butter and went into the kitchen to prepare the hamburger. She left the swinging door into the kitchen open, and the defendant entered the kitchen just as she was finishing the hamburger and commented that she had a nice place. Mrs. Enz did not reply and handed him the plate containing his hamburger.

The defendant then returned to the counter, rapidly ate the hamburger and declined Mrs. Enz' offer of coffee. He handed her a $20 bill, and she gave him change, taking $15 from her wallet in the cash drawer and the remainder from the cash register. The defendant then informed Mrs. Enz that he thought he had given her a $5 bill, and she assured him that it was a $20 bill and that she had given him the proper change. Defendant gave her a "terrible" look and kept on talking, and she felt that she was dealing with a crazy or drunk man, but she was unable to say with certainty just what was his condition. She went to the cash drawer to get the $20 bill to give back to defendant. As she was reaching for

2"It is the opinion of this Court, based on the evidence that we have heard in this case, that the guilt of the defendant in this case has been proved beyond a reasonable doubt as to each of the counts of the indictment."

the $20 bill, she discovered that defendant was upon her and that he had seized a knife from the steam table. He stabbed her in the chest and in the arm, informed her that he was going to kill her and then stabbed her in the stomach. Mrs. Enz managed to force the knife out of her stomach and recalled nothing thereafter. However, when she subsequently regained consciousness in the hospital, she learned that she had also been stabbed three times in the back and that she had broken bones beneath her eyes and a broken jaw.

Ralph Libecap testified that at approximately 12:30 p.m. on the day of the assault, he entered the Peacock Club, a bar which was located next door to the Enz restaurant and which adjoined another restaurant called Susie's Café. Defendant Davis, whom Libecap had seen on at least two prior occasions, was present in the bar when Libecap arrived. Libecap described defendant as being boisterous and loud and stated that he repeatedly announced that he could beat up anyone in the bar for $100. Defendant was ultimately ordered to leave the bar and was then refused service in Susie's Café, after creating a disturbance. Officer Osgood, a San Francisco police officer who was then on vacation, was also present in Susie's Café at the time. In response to a request by a waitress, he ordered defendant out of the restaurant at approximately 1:30 or 2 p.m.

Both Libecap and Osgood testified that although defendant had been drinking, he was not intoxicated. Both men stated that he was wearing a gray sport coat, a white shirt and a tie when he left Susie's Café.

Shortly after defendant left Susie's Café, the bartender asked Libecap to walk down the street and purchase a particular brand of whiskey. After completing this errand and while on his way back to the Peacock Club, Libecap walked past the Enz restaurant and heard a muffled moaning noise. He looked in the window of the restaurant and saw defendant standing with his hand in the cash register. The right sleeve of defendant's coat appeared to be stained up to the elbow. Libecap immediately returned to the Peacock Club and told the bartender to call the police. He also saw Osgood and told him that a lady in the restaurant around the corner had been hurt, and Osgood immediately proceeded to the scene.

Osgood testified that he found Mrs. Enz lying on the floor, moaning and covered with blood. After he had applied a tourniquet to her arm and had called for an ambulance, she

furnished him with a description of her assailant. Defendant matched this description in every respect.

Osgood subsequently returned to the Peacock Club and was present when defendant re-entered the bar approximately an hour later. Both Osgood and Libecap, who was also present in the bar, stated that defendant was no longer wearing either a coat or a tie. Osgood further stated that defendant's shoes were stained with what appeared to be blood. Defendant was placed under arrest, and his clothes were taken into police custody.

Officer Murphy arrived at the Enz restaurant at 3 p.m. on the day of the assault. He found the cash register open and empty, except for approximately 30 cents in change, and he also found some change strewn about on the floor. Approximately $50 or $60 had been taken from the register, and approximately $120 had been taken from Mrs. Enz' wallet in the cash drawer. A knife was lying in a rear corner of the restaurant, and there were bloodstains on the walls and floor. A piece of paper lying on the floor bore a heel print which was found to be similar to the pattern on the heel of defendant's shoes, although the print was not clear enough for a positive identification. Incomplete footprints on the floor were similar in length and size to defendant's shoes.

When defendant was searched by the police immediately after his arrest, he was found to have a small cut, which appeared to be fresh, at the base of his right index finger. Stains on the knife and the piece of paper found in the restaurant and on the shoes worn by defendant were tested by a criminalist and found to be type "O" human blood. A T-shirt worn by defendant contained a brown stain which appeared to have been partly removed. The criminalist was able to determine that the stain was human blood but could not determine the type. Both defendant and Mrs. Enz had type "O" blood.

Defendant was found to be in possession of $28.86 at the time of his arrest, and two of the $1 bills were stained with human blood. Officer Murphy, who saw defendant shortly after his arrest, was of the opinion that he had been drinking, but was not drunk.

Defendant did not testify. True, he did make representations as to his condition and state of mind on the day he committed the crimes of which he was found guilty to a psychiatrist, Dr. Levy, but these are not under oath and have not been tested in the crucible of cross-examination, although they

necessarily provide the only basis for the doctor's testimony.

The sole witness for the defense was Dr. Levy, who had been appointed by the court to examine defendant in connection with a plea of not guilty by reason of insanity which was withdrawn early in the trial. Dr. Levy stated that he had interviewed defendant on October 8, 1966, for approximately an hour and a half. According to the history which defendant gave Levy, he had been released from the county jail approximately 10 days prior to the assault on Mrs. Enz. Since he was feeling quite nervous, he went to a clinic and obtained a prescription for Thorazine and Librium. According to Levy, the former drug is a major tranquilizer used for the treatment of agitation, and the latter drug is a minor tranquilizer used for the treatment of anxiety symptoms. On the morning of the assault, defendant arose at 8:30 a.m. and took two tablets of each of the drugs prescribed. Defendant then met a friend and the two began drinking. Defendant denied that he had any recollection of the next three to four hours, but stated that he had a vague memory of someone looking at his hand and that he "came to" either in the county jail or at the Hall of Justice. Defendant also told Levy that he had begun drinking at the age of nine and had had a problem with alcohol for a number of years. On two prior occasions, he had driven from Santa Cruz to San Jose, after he had been drinking, and had found that he had no money and no recollection of having driven that distance.

In Levy's opinion, the history related by defendant was truthful. Although Levy had concluded that defendant was not insane in the sense that he was incapable of knowing the nature and quality of his actions and recognizing that they were wrong, Levy felt that if defendant was drunk on the day of the assault, his judgment had quite likely been impaired to such an extent that he could act without wilfulness and premeditation.

Levy admitted that he had no information relative to defendant's state of intoxication on the day of the assault other than the facts related by defendant and the police report, which indicated that defendant had been involved in some type of altercation shortly prior to the assault. In Levy's opinion, a person with a history of heavy drinking could experience a blackout such as that described by defendant without exhibiting such obvious signs of intoxication as staggering, weaving about or talking incoherently. Levy was also of the opinion that a person who was in a state of black-

out as the result of intoxication could be capable of engaging in wilful, purposeful conduct such as recognizing the opportunity to rob a lone female employee, stabbing her repeatedly and threatening to kill her. Although a man in this state would be capable of carrying out coordinated, purposeful conduct of this nature, Levy believed that he would have an altered awareness of the wrongfulness of such conduct. He would be aware of what he was doing and would be capable of forming the intent to take a human life, but his judgment might well be impaired to the extent that he would be operating under a different set of values. Levy was of the opinion that a man in this state might be able to premeditate and deliberate or, on the other hand, might act quite impulsively. Levy felt that it was quite likely that defendant was unable to form a specific intent at the time of the commission of the offenses with which he was charged. However, Levy admitted that with a temporary state, such as that caused by intoxication, it was simply a matter of guessing as to what the individual's condition was at the time. Levy felt that from a psychiatric point of view, defendant's judgment was impaired, but he admitted that he would merely be guessing as to the degree of impairment. If defendant's judgment was impaired, it would very likely have affected his ability to form specific intent.

It is apparent from the above summary of the evidence that the combined force of the eyewitness testimony and the physical evidence placing defendant at the scene leaves no room for doubt that it was he who assaulted Mrs. Enz and robbed her of the money in the cash register and in her wallet. Although defense counsel did attempt to shake the eyewitness identifications made by Mrs. Enz and Libecap, his efforts were unsuccessful. Since defendant elected not to testify on his own behalf, his defense thus rested solely upon the expert testimony of Dr. Levy, which was offered to prove that defendant did not possess the specific intent which is a necessary element of both crimes charged. The testimony of that witness was extremely equivocal at best, and the facts upon which he based his opinion were limited to the history furnished him by defendant and the indication in the police report that defendant had been involved in some sort of altercation shortly before he assaulted Mrs. Enz. Levy admitted that he could only make a guess as to defendant's condition at the time the crimes were committed and could state only that "if" defendant's judgment was impaired, such impair-

ment would have been "likely" to affect his ability to form specific intent.

Levy's testimony was thus extremely speculative in nature and was premised upon the assumption that defendant was intoxicated at the time he committed the crimes charged. This assumption was contrary to the testimony of two witnesses (Libecap and Osgood) who observed defendant shortly prior to the commission of the crimes and a third witness (Murphy) who observed him shortly thereafter. Their testimony clearly finds corroboration in the fact that defendant was thinking clearly enough, immediately after committing the crimes, to hide his coat and tie, which were presumably bloodstained, and the greater part of the money taken in the robbery.

The evidence in this case as to the guilt of defendant is overwhelming. In our opinion, the People's evidence, when weighed against the defendant's defense, which consisted solely of the tenuous testimony of the psychiatrist, is in effect such evidence as indisputably establishes defendant's guilt. We agree that the comment on guilt was erroneous, but we have concluded upon our examination of the record in this case that it cannot be said there was a miscarriage of justice, for it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] ; Cal. Const., art. VI, § 13.)

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied April 19, 1968, and appellant's petition for a hearing by the Supreme Court was denied May 15, 1968. Traynor, C. J., and Peters, J., were of the opinion that the petition should be granted.