Filed 6/2/14  P. v. Riddle CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057578 |
| v. | (Super.Ct.No. INF1200101) |
| TRAVIS RAY RIDDLE, JR., | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina and Joy

Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

A jury found defendant Travis Ray Riddle, Jr. guilty of failing to register as a sex offender within five days of changing his residence.  (Pen. Code, § 290, subd. (b).)[1]  A mistrial was declared on two related charges after the jury failed to reach verdicts:  failing to register at all addresses where he resided (§ 290.010) and failing to notify law enforcement of change of his address within five days of relocating (§ 290.013).  The trial court found defendant had 16 of 17 alleged prior strike convictions, denied his *Romero*[2] motion to strike his prior strikes, and sentenced him to 25 years to life based on his recidivism and his current failure-to-register conviction.

On this appeal, defendant claims (1) the court erroneously admitted his involuntary confession to police that he failed to register, (2) the court abused its discretion in refusing to strike his strike priors, and (3) his life sentence must be vacated because it constitutes cruel and unusual punishment under the federal and state Constitutions.  We affirm.  For the reasons we explain, defendant's confession was voluntary and properly admitted, the court properly refused to strike defendant's prior strike allegations, and his life sentence did not constitute cruel and/or unusual punishment under the federal or state Constitution.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

## II.  THE TRIAL ON THE CURRENT CHARGES

A.  *Prosecution Evidence*

In 2011, defendant was a convicted sex offender who was required to register his home address with the law enforcement authority in the jurisdiction where he resided, both annually and within five days of relocating to an address in the jurisdiction.  (§ 290, subd. (b).)  Nine times between November 8, 2004, and March 22, 2011, defendant registered his address with the Palm Desert Sheriff's Department.  Six of the nine times, he registered at 18830 Kris Avenue, Sky Valley (the 18830 address); the other three times, he registered at 18800 Kris Avenue, Sky Valley (the 18800 address).

Defendant signed the March 22, 2011, registration form and initialed several paragraphs indicating he understood the registration requirements.  One initialed paragraph stated:  "Upon coming into or when changing my residence address within a city and/or county in which I am residing, I must register or re-register in person within five working days with the law enforcement agency having jurisdiction over my residence."  Another stated:  "If I have more than one resident address at which I regularly reside, regardless of the number of days or nights I have spent at each address, I must register in person within five working days at each address with the law enforcement agencies having jurisdiction over each residence."

The March 22 registration stated defendant lived at the 18800 address.  The 18800 and 18830 addresses are located on the same five-acre parcel.  The 18800 address is a mobile home; the 18830 address is a single-family home.  In October 2011, defendant's

sister Frankie owned both properties and his mother Patty lived at the 18830 address.[3] No records showed defendant registered at any address other than the 18800 address between March 22 and October 27, 2011.

On May 28, 2011, Riverside County Sheriff's Deputy Evan Kibbey responded to a report of domestic violence at 53829 Calle Sanborn in Coachella (the Coachella address). When the deputy arrived, defendant was standing in the driveway wearing a torn short and told the deputy he lived there. The deputy determined defendant was the victim of a domestic violence incident.

On October 27, 2011, Chad Martin, a lead investigator with the Riverside County Sheriff's Sexual Assault Felony Enforcement (SAFE) Task Force which registered and monitored the sex offender registrations, went to the 18800 address to investigate defendant's registration compliance status. Investigator Martin was unable to access the mobile home at the 18800 address because there was a lock on a fence surrounding the property. It appeared to Investigator Martin that no one was living at the 18800 address; there was "a lot of trash piled up outside," and the blinds and curtains on the windows were pulled up, allowing Investigator Martin to see inside.

Investigator Martin next went to the 18830 address to ask about defendant's whereabouts. Patty answered the door, and Investigator Martin told Patty he was looking for defendant. Patty told Investigator Martin she was defendant's mother; he was not at

---

[3] For ease of reference, we refer to defendant's mother by her first name Patty and to defendant's sister by her first name Frankie.

4

the 18800 address; she did not want him there; he was "camping out"; she did not know his whereabouts; and she had not seen him in two or three weeks.

Later on October 27, Investigator Martin went to the Coachella address, but no one answered the door and he did not find defendant there. While Investigator Martin was attempting to speak with some neighbors, Patty drove up to the Coachella address. At that point, Patty was "a little upset with" Investigator Martin but told him defendant was living at the Coachella address. She explained that she, her husband, and defendant had lived at the Coachella address earlier in 2011; she and her husband moved out in August 2011, and defendant stayed. She did not tell Investigator Martin that defendant lived part-time with her at the 18830 address and part-time at the Coachella address. She had a key to the Coachella address. She and Investigator Martin went inside and she showed Investigator Martin defendant's bedroom. Patty acknowledged to Investigator Martin that she had lied to him earlier that day.

On November 2, 2011, defendant and Patty went to the Palm Desert sheriff's station looking for Investigator Martin, and Investigator Martin met them in the lobby. Investigator Martin had not spoken with defendant and was not expecting him. Defendant explained he was there because he had heard Investigator Martin was looking for him. According to Investigator Martin, Patty was becoming "disruptive" as they were talking in the lobby, so he asked her to leave and she left.

Investigator Martin then met separately with defendant in an interview room and told defendant he had gone to the 18800 address to perform a registration compliance

5

check, but Patty told him defendant had not lived at the 18800 address for four or five months. In response, defendant said he did not live at the 18800 address; he lived at the 18830 address and had intended to register at that address. Defendant told Investigator Martin, "I guess I gave the wrong numbers. I guess I'm in trouble then." Defendant also said, "I guess I'm in violation then," after Investigator Martin told him he was in violation of his registration obligations because he was not living at the 18800 address where he was registered.

Later during the interview, Investigator Martin told defendant, "your mom lied to me then," referring to Patty's statement that defendant lived at the Coachella address, and defendant responded, "I guess." Investigator Martin then asked, "So she needs to be the one to go to jail?" and defendant said, "Well, I wouldn't send her to jail." Later during the interview, defendant admitted to Investigator Martin that he was living and working at the Coachella address, despite his earlier claim he was living at the 18830 address with Patty. Defendant said he had not seen Patty in about a week, and no records indicated defendant had ever registered at the Coachella address.

At trial, Patty testified that on October 27, 2011, defendant lived part-time with her at the 18830 address and part-time at the Coachella address. He did not live at the 18800 address during 2011; that year, the mobile home was being rented to someone else. Patty did not recall telling Investigator Martin that defendant was not living at the 18830 address or that he had not been living at the 18800 address for months, but Patty admitted she "might have" told Investigator Martin defendant was living at the Coachella address.

6

Patty claimed that three times during 2011, "probably" before October 27, she brought defendant to the Indio sheriff's station so he could register at the Coachella address, but each time a female investigator turned them away, saying he was required to register the Coachella address in Palm Desert.

In December 2011, defendant registered at the Palm Desert sheriff's station; claiming the 18830 address as his primary residence and the Coachella address as a part-time residence. He explained to an officer he was working at the Coachella address and stayed there several times each week, but he primarily lived at the 18830 address. The officer directed him to the Indio sheriff's station where he was required to register the Coachella address.

B. *Defense Evidence*

In 2011, Enrique Ortiz lived at 18875 Kris Avenue in Sky Valley, in front of the 18830 address. Ortiz did not know defendant and had never seen him, but had often seen a black Ford F-150 truck come and go from the 18800 address. According to Patty, defendant was the only person who drove a black Ford F-150 pickup truck to the 18800 and 18830 addresses. She reiterated that she and defendant went to the Indio sheriff's station to register in 2011, and they spoke to Investigator Melissa Nieburger, who gave Patty her business card. Investigator Nieburger confirmed the card in Patty's possession was hers and her writing appeared on the card, but she did not recognize Patty or defendant.

III.  DISCUSSION

A.  *Defendant's Prearrest Statements to Martin Were Voluntary and Properly Admitted*

Defendant claims his prearrest statements to Investigator Martin—including his confession he was living at the Coachella address and related statements admitting he was not in compliance with his registration requirements—were coerced and involuntary, and therefore erroneously admitted.  He argues he only made the statements after Investigator Martin threatened to put Patty in jail.  Based on uncontroverted evidence, we conclude the statements were voluntarily made and were not the product of threats or other coercive police activity by Investigator Martin.

1.  Relevant Background

Defendant moved in limine to suppress his November 2 prearrest statements to Investigator Martin that he was not living at the 18830 address where he was registered. The defense argued the statements were involuntary and therefore inadmissible because they were made after Investigator Martin threatened to send Patty to jail.

At an Evidence Code section 402 hearing, Investigator Martin testified about his November 2 interview with defendant.  As background, Investigator Martin testified he spoke with Patty twice on October 27—first at the 18830 address and later at the Coachella address.  When Investigator Martin saw Patty drive up to the Coachella address, he "immediately" thought she had lied to him because, contrary to her earlier statement that she did not know defendant's whereabouts, it appeared she knew exactly where defendant could be found, namely, at the Coachella address.  When Investigator

8

Martin spoke to Patty at the Coachella address, he accused her of lying to him, and he also told her defendant would "end up" going back to prison after he "put [his] hands" on defendant.

Several days later, on November 2, defendant and Patty came to the Palm Desert sheriff's station looking for Investigator Martin. Investigator Martin told Patty to leave the lobby because she was being "disruptive," and she left. Investigator Martin then patted defendant down and took him to an interview room in a secured area of the station. The entire interview lasted no more than one hour, and was transcribed. During the entire time defendant was at the Palm Desert sheriff's station, he was never told he would be taken into custody or was not free to leave, and he never indicated he believed he would be taken into custody.

During the interview, Investigator Martin confronted defendant with Patty's statements that he did not live at the 18800 or 18830 addresses and had been living at the Coachella address for several months. After defendant insisted he only worked at the Coachella address and was living only at the 18830 address, the following exchange occurred:

"[INVESTIGATOR] MARTIN: So your mom lied to me then.

"[DEFENDANT]: I guess.

"[INVESTIGATOR] MARTIN: So she needs to go to jail?

"[DEFENDANT]: Well, I wouldn't send her to jail.

9

"[INVESTIGATOR] MARTIN:  Well, that's what happens to people that hamper investigations and lie, you know.

"[DEFENDANT]:  I still go out there [to Coachella].  Sometimes I'm gone for a day or two doing work."

The interview continued for several minutes, with no mention of Patty by either Investigator Martin or defendant, before defendant finally admitted he was living and working at the Coachella address.  Investigator Martin told defendant he would forward the case to the district attorney, but in the meantime defendant should register his Coachella address at the Indio sheriff's station.  Defendant was not taken into custody at the end of the interview.

The court denied the motion to suppress the challenged statements on the ground there was nothing to indicate defendant's will had been overcome by any threats or coercion, and "[s]omebody saying factually that a codefendant or a relative could be arrested for obstructing doesn't mean that any future or subsequent statements are involuntar[y]."

2. Analysis

"'[B]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.'" (*People v. Duff* (2014) 58 Cal.4th 527, 551.)  The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. (*Ibid*.)  When, as here, a defendant made a confession during a tape-recorded interview and the facts surrounding

10

the confession are undisputed, we independently review the trial court's determination of voluntariness. (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

"'"'A statement is involuntary if it is not the product of '"a rational intellect and free will."'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'"'" [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) No single factor is determinative of voluntariness; courts consider "the totality of circumstances" surrounding the confession. (*People v. Williams* (1997) 16 Cal.4th 635, 661.) A finding of coercive police activity is a prerequisite to finding a confession is involuntary. (*People v. McWhorter, supra,* 47 Cal.4th at p. 347.)

Still, a confession is not involuntary unless it is "causally linked" to coercive police activity, that is, coercive police activity must be the "the motivating cause" of the confession. (*People v. Linton, supra,* 56 Cal.4th at p. 1176; *People v. McWhorter, supra,* 47 Cal.4th at p. 347; *Hutto v. Ross* (1976) 429 U.S. 28, 30.) A threat to incarcerate or punish a member of the defendant's family *unless* the defendant confesses may render the confession involuntary. (E.g., *People v. Rand* (1962) 202 Cal.App.2d 668 [threat to take the defendant's wife and children into custody unless he confessed rendered confession involuntary].)

On the other hand, "where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate an admission." (*People v. Steger* (1976) 16 Cal.3d 539, 550; *People v. Wimberly* (1992) 5

11

Cal.App.4th 773, 787-788 [the defendant's subjective belief that police had his mother in custody and would release her if he confessed did not render his confession involuntary].) "[O]nly those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable" are prohibited. (*People v. Ray* (1996) 13 Cal.4th 313, 340.)

Defendant claims his confession to Investigator Martin that he was living at the Coachella address, and not at the 18800 or 18830 addresses, was involuntary and erroneously admitted because Investigator Martin threatened to send Patty to jail if defendant continued to deny he was living at the Coachella address. We disagree.

First, there was no coercive police conduct. Investigator Martin did not threaten to incarcerate Patty unless defendant confessed he was living at the Coachella address and was in violation of his registration requirements. Investigator Martin told defendant that *if* Patty was lying about defendant living at the Coachella address, then she would go to jail for obstructing his investigation. Investigator Martin did not suggest Patty would be jailed *unless defendant confessed*. To the contrary, Investigator Martin's admonition to defendant that Patty would go to jail *if* she were lying about where defendant had been living was a truthful observation of the consequences Patty would suffer *if* she were lying.

Further, Investigator Martin's admonition to defendant that Patty would go to jail if she were lying *was not the motivating factor* of defendant's confession and related statements indicating he was noncompliant with his registration requirements. The

12

transcript of the November 2 interview shows defendant did not admit he was living at the Coachella address immediately after Investigator Martin told him Patty could go to jail. Instead, he confessed only after Investigator Martin confronted him with several facts he could not plausibly deny, including: (1) defendant admitted he was living at the Coachella address when an officer responded to a domestic dispute there in May 2011; (2) Investigator Martin had seen defendant's clothes in one of the bedrooms at the Coachella address; (3) Investigator Martin would contact the owner of the Coachella address and ask him whether defendant had permission to be there; (4) Patty and other witnesses told Investigator Martin defendant was living at the Coachella address; and (5) Investigator Martin had been to the 18800 address, where defendant was registered, and it looked like no one was living there.

Additionally, defendant and Patty voluntarily went to the Palm Desert sheriff's station to see Investigator Martin; neither was handcuffed or placed in custody; and neither in any way indicated they believed they were in custody or were not free to leave. Thus, under the totality of the circumstances, defendant's confession to Investigator Martin that he lived at the Coachella address, and his related statements that he was in violation of his registration requirements, were voluntarily given and properly admitted.[4]

---

[4] Defendant relies on several cases involving confessions that were involuntary because they were made in response to a threat to incarcerate or punish a member of the defendant's family *unless* the defendant confessed. These include *In re Shawn D.* (1993) 20 Cal.App.4th 200, 214 (threat that the defendant's girlfriend would "get 'into trouble'" unless he confessed, coupled with promises of leniency, rendered confession involuntary), *People v. Trout* (1960) 54 Cal.2d 576, 584 (the defendant's confession was involuntary when the police implicitly conditioned wife's release from custody upon his

*[footnote continued on next page]*

B. *The Trial Court Properly Refused to Strike Defendant's Prior Strikes*

Defendant claims the court abused its discretion in denying his *Romero* motion to strike his 16 prior strike convictions. We find no abuse of discretion.

A trial court is authorized to dismiss prior strike allegations for purposes of sentencing, and in the interest of justice. (*Romero, supra*, 13 Cal.4th at pp. 504, 529-530; § 1385, subd. (a).) Its decision is reviewed for an abuse of discretion, which the defendant has the burden of establishing. (*People v. Carmony* (2004) 33 Cal.4th 367, 374, 376.) The court does not abuse its discretion unless its decision is "so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

The court's discretion to dismiss a prior strike allegation is guided by "established stringent standards" designed to preserve the legislative intent behind the "Three Strikes" law. (*People v. Carmony, supra*, 33 Cal.4th at p. 377; § 1385, subd. (a).) The court "'must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes]

---

*[footnote continued from previous page]*
confession), *People v. Rand, supra,* 202 Cal.App.2d 668 (threat to take wife and children into custody unless the defendant confessed rendered confession involuntary), *People v. Mellus* (1933) 134 Cal.App. 219, 224 (threat to incarcerate the defendant's mother unless he confessed rendered confession involuntary), and *People v. Clark* (1968) 263 Cal.App.2d 87, 89 (the defendant "badgered" into making confession when police detained his wife and son in his presence, and implicitly threatened not to let them go until the defendant confessed). Each of these cases is distinguishable because Investigator Martin did not threaten to incarcerate or punish Patty unless defendant confessed. Instead, he simply told defendant what would happen to Patty if Patty were lying about where defendant was living.

scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*People v. Carmony, supra,* at p. 377; *People v. Williams* (1998) 17 Cal.4th 148, 161.)

Defendant was born in 1966 and was 45 years old in October 2011 when he committed his current offense of failing to register as a sex offender at the Coachella address where he had been living for several months. (§ 290, subd. (b).) His 16 prior strike convictions are for attempted murder (§§ 664, 187), attempted rape (§§ 664, 261), robbery (§ 211), mayhem (§ 203), forcible rape (§ 261, subd. (a)(2)), sodomy with a person under 14 years old (§ 286, subd. (c)), three counts of forcible oral copulation on a person under 14 years old (§ 288a, subd. (c)), lewd and lascivious acts by force (§ 288, subd. (b)), three counts of assault with a firearm (§ 245, subd. (a)(2)), attempted rape by force (§§ 664, 261, subd. (a)(2)), and two counts rape by force (§ 261, subd. (a)(2)).

Defendant committed the strikes around 1983, when he was 17 years old, and "heavily addicted to drugs." The sex offenses involved his then-13-year-old girlfriend, and the attempted murder charge involved a passenger in a passing vehicle who was struck by a bullet and paralyzed when, defendant claimed, his father's rifle "accidentally" discharged and struck the passenger. The record contains scant additional evidence concerning the circumstances of the prior strikes.

In June 1985, defendant was sentenced to 38 years eight months in prison, was originally housed in the California Youth Authority, and was in state prison from 1987 until 2004, when he was released on parole. He violated parole three times, in 2004,

15

2005, and 2006. At least one of the parole violations involved a drug-related offense. He was returned to prison for violating parole, served a total of 21 years in prison, and had been out of prison for "[f]our years, five years" in October 2011. He was convicted of driving under the influence in 2005, reckless driving in 2008, and fighting in public in 2010. He also picked up a traffic offense in 2010.

Defendant told his probation officer he had last used amphetamine "[n]ot too long before [he] was arrested" on the current charges; he had been addicted to methamphetamine; he drank as much beer as he could afford from the age of 13 until his current arrest; and he was "likely" an alcoholic. His "Static-99R score" indicated he was a "moderate to high [r]isk" of sexual offense recidivism.

Defendant claims the court abused its discretion in denying his *Romero* motion to strike his prior strikes under all of the relevant circumstances, including: the strikes were remote in time and occurred during a single incident "of aberrant behavior" when he was only 17 years old; he incurred no further felony convictions until his current offense; the circumstances of his current offense did not indicate he was attempting to hide his place of residence or evade authorities; he had been in compliance with his registration requirements for seven years before his current offense; and a second strike sentence would have resulted in a substantial determinate term of six years in prison. He was also employed, engaged to be married, and 46 years old at the time of sentencing, making him "beyond the age when his youth and other influences affect his decision making and make recidivism unlikely."

16

We find no abuse of discretion. The record shows that the trial court understood it had limited discretion to strike the prior strike allegations, and properly denied the *Romero* motion after considering all of the relevant facts and circumstances. In denying the motion, the court pointed out defendant had not led a crime-free life following his release from prison in 2004. Had he done so, the court said it would have considered the prior strikes remote in time. The court was also concerned that the prior strikes were committed when defendant was addicted to controlled substances, and his Static-99R score indicated he was a moderate to high risk of sex offense recidivism. The court also rejected defendant's claim there was no evidence he was attempting to evade detection when he failed to register at the correct address. To the contrary, the court said it was clear from the evidence presented at trial that defendant knew what he was doing, and he was attempting to avoid detection by failing to register at the correct address. The court observed defendant knew he had to register, knew how to register, and made the conscious decision not to register at his correct address in order to avoid detection.

*People v. Cluff* (2001) 87 Cal.App.4th 991, upon which defendant relies, is readily distinguishable. There, the defendant was paroled in 1990 and was not arrested for another offense until 1997, when he failed to annually *update* his sex offender registration. (*Id*. at p. 999.) He was still living at his registered address, however, and he "promptly came to the station" when contacted. (*Id*. at p. 1001.) The trial court refused to strike any of the defendant's prior strike allegations on the ground he was attempting to evade authorities by failing to renew his registration. (*Id*. at pp. 1001-1003.) The

17

appellate court reversed and remanded for a new *Romero* hearing, finding nothing in the record indicating defendant was attempting to evade authorities when he failed to update his registration. (*Id*. at pp. 1002-1005.) The trial court's unsupported factual finding was critical to its denial of the *Romero* motion, and the appellate court noted the case involved "the most technical violation" of section 290 it had ever seen. (*Id*. at pp. 994, 1004.)

Here, by contrast, defendant did not lead a crime-free life following his release on parole in 2004, and he was not and had not been living at his registered address for several months on October 27, 2011, when Investigator Martin went looking for him. In addition, after defendant finally admitted to Investigator Martin during the November 2 interview that he was living at the Coachella address, he indicated he had not registered at the Coachella address because, four or five months earlier, "people" from "[s]ome kind of sex offender group" had been following him, and he did not like to bring up his past. Based on this evidence, the court reasonably found defendant was knowingly and intentionally attempting to evade detection by failing to register at the Coachella address.

C. *Defendant's Life Sentence is Not Cruel or Unusual Under the Circumstances*

Lastly, we address defendant's claim that his 25-year-to-life sentence violates both state and federal constitutional prohibitions against cruel and/or unusual punishment. He advances the same arguments he made in support of his claim that the trial court abused its discretion in denying his *Romero* motion, emphasizing there was no evidence he was knowingly and intentionally attempting to evade detection by failing to register at the Coachella address.

18

*In re Coley* (2012) 55 Cal.4th 524 is directly on point and controlling on defendant's Eight Amendment claim. Like defendant, the defendant in *Coley* had a "very significant criminal history" and his current offense of failing to register was knowing and intentional. (*Id*. at pp. 531, 561.) In light of the defendant's "very serious criminal history," the court reasoned that his deliberate failure to register could "properly be viewed as an indicator of potentially significant future dangerousness." (*Id*. at p. 562.) Accordingly, the court held that the defendant's indeterminate life sentence, imposed under the Three Strikes law, did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. (*Ibid*.) Here, too, defendant's significant criminal history, coupled with his deliberate failure to register at the Coachella address, indicated he posed a significant danger to society, justifying his indeterminate life sentence.

Defendant's state constitutional claim fails for essentially the same reasons. Our appellate court colleagues have upheld the imposition of indeterminate life sentences in similar circumstances—where the defendant's criminal history is significant and the defendant's triggering offense of failing to register was knowing and intentional. (*People v. Nichols* (2009) 176 Cal.App.4th 428, 435 [upholding indeterminate life sentence under the Three Strikes law when triggering offense was willful failure to register within five working days of an address change, and the defendant had a significant criminal history]; *People v. Meeks* (2004) 123 Cal.App.4th 695, 709-710 [same].)

## IV.  DISPOSITION

The judgment is affirmed.

19

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.